Moss, Judge,
delivered the opinion of the court:
On January 3, 1911, the plaintiff, Poole Engineering and Machine Company, entered into a contract with the United States Government for the manufacture for the use of the Ordnance Department of nine 12-inch barbette gun carriages in accordance with certain plans and specifications, at the price of $49,000 each to be delivered, the first carriage on or before January 3, 1918, and all of the nine carriages on or before July 3, 1918. Said contract provided that the steel castings necessary for the construction of the carriages would be furnished by the Ordnance Department beginning on or before April 3,1917, and to be completed on or before October 3,1917.
The Government failed to furnish the castings for the first carriage by April 3,1917, and also failed to furnish the castings required for all the carriages by October 3, 1917. Castings for the first carriage were not delivered until November 6, 1917, and the last of the castings for the whole number were not delivered until June 17, 1919, more than a year after the entire work was to have been completed.
It is alleged that the rates of wages prevailing during 1917 and the first half of 1918 were substantially lower than they were in the last half of 1918 and the first half of 1919, for the same character of labor. Plaintiff avers that but for .the delay by the Ordnance Department in furnishing the steel castings it-could and would have completed the contract within the specified time* and under the lower rates of wages, and that by reason of said delay ,it has been damaged-in the *241 sum of $150,000. It is also alleged by plaintiff that it was required to maintain its organization for the performance of its contract, and that the overhead expenses chargeable to this work after July 3, 1918, together with the proper share of administrative expenses, likewise chargeable to defendant’s delay, amounted to the sum of $15,000. This suit is for the recovery of the sum of these two items, $225,000.
On May 6, 1919, which was a few weeks before the completion of the work under the contract, plaintiff wrote a letter to the Chief of the Ordnance Department, calling attention to delays occasioned by the failure of the Government in furnishing the castings and also on account of changes in specifications provided for in the contract. In this letter particular reference is made to the matter of liquidated damages which might be claimed by the Government under the terms of the contract. It is further stated, “We simply want to go on record at this time that we intend to ask the Government to reimburse us up to our fair cost, otherwise we feel that we would be done a great injustice. We have all the facts and data in connection with this contract, and would be pleased to have you advise us how to proceed.”
It is interesting to note that, so far as this record discloses, the question of damages was never again mentioned by plaintiff. On receipt of the letter the question of a waiver of liquidated damages was taken up for consideration, and after an investigation by representatives of the Government it was determined that the Ordnance Department had been responsible for plaintiff’s delay, and the amount which had been retained from time to time as liquidated damages was paid to plaintiff. The final payment of the contract price, on the delivery of the last gun carriage, was made on July 10, 1919. Various other items constituting a claim for the extra cost of changes authorized by the contract and involving a substantial sum were paid at different periods, each being the subject of more or less correspondence, but at no time during the discussion and settlement of these various *242 items did plaintiff suggest that he would claim damages against the Government. The purpose of the letters from plaintiff to the Government prior to May 6, 1919, according to the testimony of Clay C. Bartlett, purchasing agent of plaintiff, on cross-examination, was to expedite delivery in order that the contract might be completed within the specified time, thereby relieving plaintiff of liability for liquidated damages. Obviously, there was no thought during the progress of the work of any claim for damages.
The vice president of the company, Dudley Shoemaker, testified on cross-examination that the question of damages was first considered “ when we closed our books and the comptroller of the company showed us how much our cost exceeded our estimates.” Certainly the books were not closed on this account until long after the letter of May 6, 1919. Plaintiff’s damages, if any, grew out of the contract. It was a part of plaintiff’s claim on account of work performed under the contract. Plaintiff should have definitely asserted its claim at or before the final payment. The letter of May 6, 1919, is not the assertion of a claim for damages. It is nothing more nor less than the declaration of an intention to request a reimbursement of its loss on account of increased cost of labor and overhead. Plaintiff’s conduct thereafter was such as to justify the assumption that even if plaintiff in good faith intended on May 6, 1919, to claim damages that intention had been abandoned. In the light of the statement of the vice president that the first thought of a claim for damages was when the books were closed, there can be little doubt as to the correctness of this assumption.
Plaintiff’s course throughout the whole transaction, as will presently be more fully shown, is clearly indicative of a feeling of uncertainty as to whether or not it had a valid and enforceable cause of action against the Government.
The evidence as to the amount of damages herein is unsatisfactory. Witnesses endeavored to give an estimate as to the proportion of the increased cost of labor and cost of overhead expenses properly chargeable to plaintiff’s contract. During this same period plaintiff had on hand several other *243 contracts with the Government, one of which involved the construction of two additional gun carriages of precisely the same type and class as those constructed under the first contract. It had ten times more work than it could handle, according to the testimony of one of plaintiff’s witnesses. The difficulty of distributing increased cost of operation to any particular contract is at once apparent. As illustrative of the indefinite and uncertain character of the evidence upon which plaintiff relies herein, it might be mentioned that plaintiff’s chief witness on this point, Allen O. Stehl, an accountant, estimated the amount chargeable to this contract on account of excess labor at $24,501.81; for excess cost of “shop overhead,” $68,039.41; and excess cost of “ general overhead,” $24,799.51, making a total of $117,340.79. This witness was introduced later and testified that in his first estimate he had included the excess cost on the two additional carriages mentioned above, and he therefore desired to reduce his total estimate to $95,984.77. This was accomplished by deducting from $117,340.79 two-elevenths of that sum. The witness stated that there was no way to determine the exact amount. Mr. Shoemaker, in response to a question on cross-examination concerning the proportion of “overhead ” cost chargeable to plaintiff’s contract, stated “ It is impossible for me to answer that question; it is impossible for anybody to answer it. We tried to do that on another contract, distributing overhead on other contracts going through at the same time.” Considering all the evidence we are inclined to agree with the witness, who with the advantage of a previous unsuccessful experiment declared that it was impossible of accomplishment. There was no appreciable loss of time on account of delays in the delivery of the castings. The labor employed on the gun-carriage contract was merely shifted to other work during any delay period.
The contract involved herein contains another provision which is determinative of the case. It is as follows:
“In making settlements in which such charges are involved the contractor shall receive credit for all delays which the contracting officer or his successor may determine to have been due to action of the United States and for such other *244 delays as the same authority may decide to have been due to such unavoidable causes, including fires, unseasonably severe storms, and labor strikes in the works of the contractor, as occurred before the date upon which final delivery is due under the provisions of Article I, or before the expiration of the time thereafter for which credit is allowed under this article; and the date of the final delivery shall be considered for the purpose of settlement as the date of actual final delivery less the delays for which credit has been allowed; but none of the above causes shall constitute a basis for action against the United States for damages.”
The history of this litigation deserves notice. The original petition in this case was filed December 7,1921. To this petition defendant interposed a demurrer, which was sustained by the court in an opinion by Chief Justice Campbell, in which the questions in issue were thoroughly considered. (57 C. Cls. 232.) After discussing the contract involved herein as to certain aspects of the case the court said, “but it also provides that ‘none of the above causes shall constitute a basis for action against the United States for damages.’ If there was otherwise a cause of action on account of alleged delays, this stipulation is sufficient to defeat it.”
Thereafter on motion for new trial the order of dismissal was set aside and by leave of court plaintiff filed an amended petition. Demurrer to the amended petition was overruled without prejudice. Evidence was taken, the case was referred to a commissioner for findings of fact, and the report of the commissioner was filed April 26, 1926. Plaintiff filed certain exceptions to the commissioner’s report, and on the same day presented a motion to defer further action in the prosecution of the case. This motion, which was granted, was predicated upon the following memorandum signed by plaintiff’s attorneys:
. “ Claimant is this day filing its exceptions to the commissioner’s findings in this case, but respectfully asks leave to defer printing these exceptions and asks the court to defer talcing any action on same pending action of the Supreme Court on writs of certiorari being filed in the three cases, Lange and Bergstrom, Nos. C-930 and C-931, and H. P. Converse & Co., No. C-Í202. If writs are denied in those cases motion to dismiss the present case will be made, as *245 •claimant could bave no hope of favorable action by this court as long as this court’s interpretation of the Supreme Court’s decision in the H. E. Crook Co. case prevails.”
The Supreme Court denied the .writs in the three cases referred to in plaintiff’s motion. No motion was made by plaintiff to dismiss, nor did counsel for the Government move for dismissal on account of plaintiff’s stipulation, and the case was allowed to proceed. In its supplemental brief plaintiff offers through coimsel an “ explanation and apology for what might otherwise appear an anomalous situation,” the suggestion that plaintiff itself “ is unwilling to abide the then judgment of its counsel, and insists that the case proceed to trial on the merits.”
In granting a motion of this character the court has the right to rely upon the stipulated conditions contained therein. Plaintiff’s motion contained the declaration that plaintiff “ could have no hope of favorable action by this court as long as this court’s interpretation of the Supreme Court’s decision in the H. E. Crook Co. case, prevails,” and further declared its purpose to move for a dismissal in the event the writs should be denied. It is fair to assume that in granting the motion the court was influenced by the express avowal ■of plaintiff’s purpose to dismiss its action in the event the writs of certiorari should be denied, as offering the opportunity for a speedy disposition of the case.
The argument of plaintiff’s counsel on the question of the applicability of the decisions mentioned in said motion is not convincing. This court entertains the- same view now as was expressed in the opinion of the Chief Justice in sustaining the demurrer to the petition. The case is controlled by the Crook Co. case, 270 U. S. 4; Merchants’ Loan & Trust Co. case, 40 C. Cls. 117; Wells Bros. Co. case, 254 U. S. 83; Chas. F. Wood et al. case, 258 U. S. 120, and other cases.
It is the judgment of the court that plaintiff’s petition and amended petition should be and the same are hereby dismissed.
Geaham, Judge; Hay, Judge; Booth, Judge; and Campbell, Chief Justice, concur.